Hose Co. v. Smith, 2025 NCBC 17.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV050767-590

THE HOSE COMPANY LLC,

    Plaintiff,

v.

ROBERT M. SMITH,

    Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS**

1.     **THIS MATTER** is before the Court on Defendant's Motion to Dismiss (the Motion) filed pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the Rule(s)), (ECF No. 32).

2.     The Court, having considered the Motion, the briefs supporting and opposing the Motion, and the parties' arguments at a hearing held on 27 February 2025, concludes for the reasons stated below that the Motion should be **GRANTED in part** and **DENIED in part**.

> *Robinson, Bradshaw & Hinson, P.A. by Julian Wright and Kelley Storey, for Plaintiff.*
>
> *Bell, Davis & Pitt, P.A. by Marc Gustafson and Kevin Roak, for Defendant.*

Earp, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

3.     The Hose Company (THC) is a Wyoming corporation with operations in Union County, North Carolina.  (Ver. Compl. ¶ 1, ECF No. 3.)  It has operated in the hose industry for about ten years selling hydraulic, pressure washing, and industrial hose.  In addition to hose, it also sells hose fittings, adapters, accessories, and bundles of complete, ready-to-install custom hose setups throughout the United States and Canada.  (Ver. Compl. ¶ 3.)

4.     THC's hydraulic hose is sold under the brand name Hydrauli-Flex.  Its general-purpose water and chemical hose is called Soft Jet, and its pressure-washing hose is known as Fierce Jet.  (Ver. Compl. ¶¶ 5–7.)

5.     Robert M. Smith (Smith) worked at THC from approximately September 2016 to January 2024, first as Operations Manager and then as General Manager.  (Ver. Compl. ¶ 8.)  He became a shareholder in THC beginning in May 2021 and continuing until his resignation.  (Ver. Compl. ¶ 9.)

6.     Smith's duties included management of the design, manufacture, assembly, and sale of hydraulic, pressure washing, and industrial hose.  Further, Smith looked for, developed, and analyzed potential business partnerships with and acquisitions by THC of other companies and assets in the hose business.  (Ver. Compl. ¶ 8.)

7.     Based on his position, Smith had access to THC's confidential information including pricing; operating costs and expenses; budgeting; supplier data; customer data, needs and preferences; customer relations; proprietary technology; operational processes and tools; and market strategy and performance.  (Ver. Compl. ¶ 10.)

8. On 20 July 2022, Smith signed a Noncompetition Agreement (the Agreement) in exchange for increased compensation. (Ver. Compl. ¶ 11.) The agreement contained the following noncompetition provision:

1. Noncompetition.

(a) [Smith] agrees that, during the Restricted Period, [Smith] shall not accept employment to design, manufacture, assembly [sic], and sale [sic] of hydraulic and industrial hose, or to perform any other services which are the same as or similar to services [Smith] has performed or will perform for [THC], within the Restricted Territory.

(Ver. Compl., Exhibit 1 Noncompetition Agreement [Agreement] § 1(a).)

9. The restricted territory and restricted period were defined in the Agreement as follows:

(b) As used herein, the following terms shall have the following meanings:

"Restricted Territory" means the following: (i) the geographic area within a 100-mile radius of [THC's] facility at 301 Warehouse Drive, Matthews, North Carolina; (ii) Mecklenburg County, North Carolina; (iii) counties contiguous to Mecklenburg County, North Carolina; (iv) the State of North Carolina; (v) states contiguous to the State of North Carolina; (vi) the State of South Carolina; (vii) the State of Georgia; (viii) the State of Virginia; (ix) the State of Tennessee; (x) the State of Florida; (xi) the State of Texas; (xii) the contiguous United States; (xiii) the United States; (xiv) or in any geographic area within a 5-mile radius of [THC] locations or [THC] customer locations in which the Employee exercised responsibility or serviced customers of the Company.

"Restricted Period" means a period that is two years after the termination of [Smith's] employment with [THC], whether voluntary termination by [Smith] or termination for cause by [THC.]

(Agreement § 1(b).)

10. On 2 January 2024, Smith submitted his resignation letter, stating in pertinent part:

My last working day will be January 19th, 2024, as I have accepted a new opportunity as the Director of Integration Business Development at Triosim, a paper and pulp manufacturing and servicing company based in Appleton, WI.

\* \* \* \*

Additionally, in accordance with my non-competition agreement, my new role at Triosim will not involve direct engagement or contact with any of The Hose Company's customers, vendors, or employees. I am committed to upholding the terms of our agreement and ensuring seamless transition.

(Ver. Compl., ¶ 19, Exhibit 2 Resignation Letter [Resignation Letter].)

However, following Smith's departure from THC, Plaintiff became aware of Smith's involvement in the hose business on behalf of Triosim Corporation (Triosim) and others.

A. Smith's Work with Triosim

11.   After leaving THC, Defendant began working as Director of Integration and Business Development for Triosim. (Ver. Compl. ¶ 20.) THC believed that Smith was working in the paper and pulp industry. (Ver. Compl. ¶ 22.)

12.   After his departure, THC sent Smith a letter reminding him of his contractual obligations. (Ver. Compl. ¶ 53.) On 9 May 2024, Triosim's counsel confirmed that Triosim was aware of THC's Noncompetition Agreement and that it was utilizing Smith to perform services that did not compete with THC to ensure that Smith complied. (Ver. Compl. ¶ 55.) Plaintiff relied on these representations. (Ver. Compl. ¶¶ 70–71.)

13.   On 7 August 2024, however, an email inadvertently sent to Smith's old THC email address revealed that Smith was engaged in the industrial hose industry in

some capacity for a company called Albany Rubber & Gasket (Albany). (Ver. Compl. ¶ 23; Ver. Compl., Exhibit 3.) THC investigated and determined that Smith was working for Trident Services, LLC (Trident), a division of Triosim. (Ver. Compl. ¶¶ 24–25.) Albany, which sells industrial and hydraulic hose, is a subsidiary of Trident located in Georgia. (Ver. Compl. ¶ 26.)

14. Other subsidiaries of Trident include Montgomery Rubber & Gasket (Montgomery) located in Alabama, MS Rubber (MS) located in Mississippi, and Pensacola Rubber & Gasket (Pensacola) located in Florida. (Ver. Compl. ¶ 27.) Albany sells industrial and hydraulic hose; Montgomery and MS sell hydraulic and industrial hose and fittings; and Pensacola sells all types of hose products including industrial, hydraulic, metal, tubing, ducting, and automotive. (Ver. Compl. ¶¶ 29–33.)

B. Christoper Inks and Manatee

15. Christopher Inks (Inks), Smith's longtime friend, began working for THC on or about 29 April 2020. Inks was not required to sign a noncompetition agreement because Smith vouched for his character. (Ver. Compl. ¶¶ 35–36.)

16. THC believes that Inks and Smith began discussing a partnership to develop and sell hoses and hose-related parts while they were both employed by THC, but they did not have the capital to do so on their own. (Ver. Compl. ¶ 45.)

17. In November 2023, while both were employed by THC, Smith and Inks traveled to California with individuals from Manatee Pressure Washer Supply and Repair (Manatee), one of THC's Fierce Jet hose customers, to identify warehouse

space and discuss a potential joint venture between THC and Manatee. (Ver. Compl. ¶¶ 41, 46.) The idea did not progress after the trip. (Ver. Compl. ¶ 47.)

18. Approximately three months later, American Pressure Equipment, LLC (APE), a company affiliated with Manatee, was incorporated in Florida. (Ver. Compl. ¶¶ 38, 40.) APE sells its own line of pressure washing hose under the brand name Rampage, which competes with THC's Fierce Jet. (Ver. Compl. ¶ 44.) Plaintiff alleges that both Smith and Inks approached Manatee and "played roles" in starting the business. (Ver. Compl. ¶¶ 38, 48.)

19. THC alleges that Inks began working for APE and Manatee in early 2024, while he was still a THC employee. (Ver. Compl. ¶ 49.) During this time, THC believes that Inks consulted with Smith regarding APE products that compete with THC's products. (Ver. Compl. ¶¶ 42–43.) THC also believes Inks coordinated with Smith to copy THC's information. (Ver. Compl. ¶ 50.) When THC discovered the conflict of interest, it terminated Inks' employment on 24 April 2024. (Ver. Compl. ¶ 51.)

20. After Inks was terminated, THC learned from one of its customers, L&H Industrial, that APE had been trying to lure it away. (Ver. Compl. ¶ 52.)

21. THC's Complaint, filed 30 October 2024, alleges claims against Smith for (1) breach of contract; (2) fraudulent concealment with respect to his work with Triosim and its affiliates in the hose industry; (3) fraudulent concealment with respect to his work with Inks, Manatee, and APE to develop a competing product while he was General Manager of THC; (4) misappropriation of trade secrets (THC's

customer lists and pricing information); (5) violation of the North Carolina Unfair and Deceptive Trade Practices Act; and (6) civil conspiracy. (*See generally* Ver. Compl.)

22. On 6 January 2025, Smith filed this Motion, as well as his Answer to the Complaint, (ECF No. 34). On 27 February 2025, the Court held a hearing on the Motion. Both parties appeared and were heard. The Motion is now ripe for decision.

## II. LEGAL STANDARD

23. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Isenhour v. Hutto*, 350 N.C. 601, 604 (1999) (cleaned up). Dismissal is proper when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation and quotation marks omitted).

24. The Court does not make findings of fact when deciding a motion to dismiss. It recites below factual allegations from the Verified Complaint that are relevant to a determination of the Motion. *See, e.g., White v. White*, 296 N.C. 661, 667 (1979) (stating that the purpose of "a motion to dismiss is to test the law of a claim, not the facts which support it").

25. In deciding the motion, the Court must treat all well-pleaded allegations as true and view the facts and permissible inferences in the light most favorable to the nonmoving party. *See, e.g., Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332

(2019). However, while the allegations are liberally construed, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. DHHS, Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)).

## III.   ANALYSIS

26.    Defendant contends that each of the claims brought by Plaintiff fails as a matter of law and should be dismissed. (Def. Robert M. Smith's Br. in Supp. of his Rule 12(b)(6) Mot. to Dismiss [Def.'s Br.] at 5, ECF No. 33.) The Court addresses each claim below.

### A. Breach of Contract

27.    The Court has already addressed THC's claim for breach of contract in response to THC's Motion for Preliminary Injunction. (Order on Pl.'s Mot. for Prelim. Inj., ECF No. 58.) The claim is based solely on Smith's alleged breach of a noncompetition provision in an agreement with THC that Smith signed while employed. Because the Court has concluded that the noncompetition provision at issue is unenforceable as a matter of law, the Motion shall be **GRANTED,** and THC's claim for breach of contract is dismissed with prejudice.[1]

---

[1] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court." *First Fed Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013).

B. Fraudulent Concealment

28. THC brings two fraudulent concealment claims against Smith. The first alleges that he fraudulently concealed the fact that, after leaving THC, his employment with Triosim would involve working, identifying, and acquiring companies and assets in the industrial hose industry, including Albany, Montgomery, MS, and Pennsacola. (Ver. Compl. ¶¶ 65–66.) The second alleges that during his employment with THC, Smith fraudulently concealed his work with Inks, Manatee, and APE to develop a competing business. (Ver. Compl. ¶ 75.)

29. "[F]raudulent concealment or fraud by omission is, by its very nature, difficult to plead with particularity." *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at **9 (N.C. Super. Ct. June 18, 2007) (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997)). THC must plead:

> (1) the relationship [between the plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why [the] plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Breeden*, 171 F.R.D. at 195–96 (adopted by *Lawrence*, 2007 NCBC LEXIS 20, at **10).

30. To plead fraudulent concealment there must be a duty to disclose. Such a duty arises when: (1) a fiduciary relationship exists between the parties to the transaction; (2) a party has taken affirmative steps to conceal material facts from the other; or (3) one party has knowledge of a latent defect in the subject matter of the

negotiations about which the other party is both ignorant and unable to discover through reasonable diligence. *See, e.g.*, *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009).

31. Smith contends that both fraudulent concealment claims fail because he was under no obligation to make disclosures to THC. He argues that THC has not pled either (1) that while employed as a manager, he exercised sufficient dominance and control over THC to be required to make disclosures as its *de facto* fiduciary or (2) that when he left THC, he took affirmative steps to conceal material facts regarding his job with Triosim. (Def.'s Br. at 17–20.)

32. "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355 (2019) (citing *Lockerman v. S. River Elec. Mbrshp. Corp.*, 250 N.C. App. 631, 635 (2016)).

33. THC argues that it has adequately pled that Smith was THC's fiduciary because it has alleged that, as General Manager, Smith was a "company official" and company officials owe fiduciary duties to their companies as a matter of law. (Pl.'s Opp. to Def.'s Mot. to Dismiss [Pl.'s Opp] at 18–20, ECF No. 48, citing N.C.G.S. § 57D-3-23.) But that is not what the Verified Complaint actually says. THC has alleged only that Smith's duty to disclose arose from his status as a *THC employee and shareholder*, not as a manager or other official of this limited liability company. (Ver. Compl. ¶¶67, 76.)

34.     A fiduciary relationship can also arise *de facto* and "extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other.*" *Dalton v. Camp*, 353 N.C. 647, 651–52 (2001) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)).  THC argues that it has pled as much because Smith held a job of "significant responsibility."  (Pl.'s Opp. at 19.)

35.     Smith is correct that employees, even those holding high-level managerial positions, typically do not owe a fiduciary duty to their employers.  "North Carolina's courts have consistently held that such a position does not give rise to fiduciary responsibilities absent allegations of extraordinary facts that, if proven, would establish that the employee controlled his  employer to the point of domination." *Langley v. Autocraft, Inc.*, 2023 NCBC LEXIS 95, at \*\*14–15 (N.C. Super. Ct. Aug. 7, 2023) (citing *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 155 (2001) (no fiduciary duty for company vice president because "[a] managerial position alone does not demonstrate the requisite domination and influence on the other required to create a fiduciary obligation"); *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at \*\*16 (N.C. Super. Ct. Oct. 1, 2007) ("Even when an employee is entrusted with substantial managerial authority, a fiduciary relationship will not exist absent evidence that such authority led to the employer being subjugated to the 'improper influences or domination of [its] employee.' " (citation omitted)); *Southeast Air Charter, Inc. v. Stroud*, 2015 NCBC LEXIS 82, at \*\*16 (N.C.

Super. Ct. Aug. 17, 2015) ("Where an employee is neither an officer nor a director, extraordinary circumstances are necessary to impose a fiduciary duty[.]")).[2]

36.     Even though THC attributes the performance of important duties to Smith, it does not sufficiently allege that he *dominated and controlled* the company. Consequently, THC has failed to plead the existence of a *de facto* fiduciary duty to support its first claim for fraudulent concealment.  *See Lockerman*, 250 N.C. App. at 636 ("The standard for finding a *de facto* fiduciary relationship is a demanding one: Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.").

37.     Because THC has not pled that Smith was its fiduciary, the Motion shall be **GRANTED** with respect to Count III of the Verified Complaint, THC's claim for fraud that occurred while Smith was employed, and this claim is dismissed without prejudice.

38.     As for Smith's post-employment activity on behalf of Triosim, THC argues that Smith's decision to word his resignation letter as he did amounted to an affirmative step to conceal the true nature of his activity in the hose industry.  (Pl.'s Opp. at 20–21.)  Interpreting the allegations in the Verified Complaint in the light most favorable to THC, the Court agrees that THC has sufficiently alleged that Smith

---

[2] Likewise, the fact that Smith was a THC shareholder is not enough to create a *de facto* fiduciary relationship.  "As a general rule, shareholders do not owe a fiduciary duty to each other or to the corporation." *Freese v. Smith*, 110 N.C. App. 28, 37 (1993) (citing Russell M. Robinson, II, *North Carolina Corporation Law*, § 11.4 (1990))

intentionally misled THC by wording his resignation letter to conceal the true nature of his new job. Given the liberal standard the Court must employ at this stage, the Motion shall be **DENIED** with respect to Count II of the Verified Complaint, THC's claim for Smith's alleged fraudulent concealment relating to his work for Triosim.[3]

C. Misappropriation of Trade Secrets

39.    THC alleges that Smith misappropriated its "customer lists and pricing information," both of which it asserts are trade secrets. Smith responds that THC has not identified its alleged trade secrets with sufficient particularity and further that THC's customer list is comprised of publicly available information. (Def.'s Br. at 21.) Similarly, Smith argues that THC's reference to "pricing information" is not specific and that there is no indication that THC took steps to keep its prices confidential. (Def.'s Br. at 24.)

40.    THC responds that courts have regularly held that these two types of information are trade secrets. (Pl.'s Opp. at 22.) THC argues that, even if publicly available information is included, its allegation that it built its customer lists throughout its 10 years of operation is sufficient to allege a compilation trade secret. (Pl.'s Opp. at 22.) Similarly, THC contends that it has sufficiently identified the pricing information as pertaining to its dealer network. (Pl.'s Opp. at 22.)

---

[3] Ultimately, to succeed on this claim, THC will be required to prove that Smith's concealment led to actual damage, an essential element for a fraud claim. *See, e.g., Speller v. Speller*, 273 N.C. 340, 343 (1968) (citing *Johnson v. Owens*, 263 N.C. 754, 756 (1965) (holding that, to be actionable, fraud must result in loss, damage or injury)).

41. "To plead misappropriation of trade secrets, 'a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur.'" *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326 (2008) (quoting *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468 (2003)). "[A] complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is insufficient to state a claim for misappropriation of trade secrets." *Aecom Tech. Corp. v. Keating*, 2012 NCBC LEXIS 9, at **7 (N.C. Super. Ct. Feb. 6, 2012) (citing *Washburn*, 190 N.C. App. at 327).

42. The North Carolina Trade Secrets Protection Act (NCTSPA) defines a trade secret as "business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process" that both:

> a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

> b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

43. Six factors assist the Court to determine whether particular information is actually a trade secret:

> (1) the extent to which the information is known outside the business;
> (2) the extent to which it is known to employees and others involved in

the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 369–70 (2001); *accord Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81 (1997).

44. It is not the case, as THC appears to argue, that pricing information and customer lists are, *ipso facto*, trade secrets. Whether they are depends on the context in which these terms are used. It is up to the plaintiff to define that context. *See, e.g., Aecom, Tech. Corp.*, 2012 NCBC LEXIS 9, at **8 (Plaintiffs' allegation that Defendants misappropriated confidential information including "customer lists, customer contract information, pricing information, and product information" was too sweeping and conclusory to identify a trade secret); *Krawiec v. Manly*, 370 N.C. 602, 611 (2017) (Plaintiffs claim identifying its trade secret only as "customer lists and contact information" was insufficient.)

45. As our Supreme Court observed, "[l]ike the Ohio Court of Common Pleas in an often cited case involving a dispute between a dance studio and its former employee, we recognize that '[t]here is no presumption that a thing is a secret,' and emphasize the shortcomings of 'general allegations' in making a case for misappropriation of trade secrets." *Krawiec*, 370 N.C. at 611 (quoting *Arthur Murray Dance Studios of Cleveland, Inc. v. Witter*, 105 N.E.2d 685, 709–10 (Ohio Ct. Com. Pl. 1952)).

46. Here, THC alludes to a compiled list of customers but does not identify the information included in the list or describe the effort and cost it incurred to put the list together. More information is necessary to allege a compilation trade secret. *See, e.g., Mech. Sys. & Servs. v. Howard*, 2021 NCBC LEXIS 69, at \*6–7 (N.C. Super. Ct. Aug. 11, 2021) (customer list that included contract terms, customer needs, pricing information, recruiting strategies, sales proposals and quotes, and correspondence with potential customers that took "many years of effort" to develop satisfied the particularity requirement to plead a trade secret.); *Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 41, at \*\*27–28 (N.C. Super. Ct. Apr. 17, 2018) (compilation of customer purchasing preferences and order histories, as well as customer requests and complaints received over many years had competitive value and was recognized as a trade secret).

47. As for pricing information, THC alleges only that it is referring to pricing that applies to its dealer network. It does not explain how this information, once released externally, is kept secret. Clearly, its dealers know what they are charged, and there is nothing in the pleading to indicate that THC's dealers cannot themselves use this information to negotiate better deals with THC's competitors. It is up to THC to plead the existence of a trade secret with particularity. Further, its general allegations regarding only internal security measures do not suffice. *Cf. Area Landscaping, LLC v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 525 (2003) (concluding at the summary judgment stage that plaintiff failed to present adequate evidence of security measures with respect to pricing); *Campbell Sales Grp., Inc. v. Niroflex by*

*Jiufeng Furniture, LLC*, 2022 NCBC LEXIS 148, at \*\*27 (N.C. Super. Ct. Dec. 5, 2022) (same); *Edgewater Servs. v. Epic Logistics Inc.*, 2009 NCBC LEXIS 21, at \*\*14 (N.C. Super. Ct. Aug. 11, 2009) (same).

48.     The Court concludes that THC has failed to allege the identity of a trade secret with sufficient particularity to support its claim, and its allegations regarding the security measures it used to keep its pricing information secret are lacking. Accordingly, the Motion as to Count IV, Misappropriation of Trade Secrets, is **GRANTED**, and this claim is dismissed without prejudice.

D. Unfair and Deceptive Trade Practice

49.     Under North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA) "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1(a).

50.     Three elements are needed to maintain a cause of action under this statute: "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) proximately causing actual injury to defendant or defendant business." *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172 (1992).

51.     Smith argues that the unfair and deceptive trade practices claim must be dismissed because the claims underlying it fail. (Def.'s Br. at 27.) THC relies on both its fraud and its misappropriation of trade secrets claims, (Pl.'s Opp. at 25), but says that, regardless of those claims, it has alleged that Smith acted in an unethical or

unscrupulous manner by deceiving THC about his work at Triosim, consulting with Inks to develop Rampage, and concealing his work with Inks and APE. (Pl.'s Opp. at 26.)

52. To the extent THC refers to Smith's conduct while employed, the Court observes that most employer-employee disputes do not affect commerce and are therefore beyond the scope of the UDTPA. *See Dalton,* 353 N.C. at 657 (recognizing that the UDTPA "does not normally extend to run-of-the-mill employment disputes").

53. In addition, the only fraud claim still standing, fraudulent concealment resulting from the wording of Smith's resignation letter, is wrongful conduct that occurred internally. *See, e.g.*, *Nobel v. Foxmoor Grp.*, 380 N.C. 116, 121 (2022) ("The internal operations of a business entity are not within the purview of the Act"); *White v. Thompson*, 364 N.C. 47, 48 (2010) ("The General Assembly did not intend for the [UDTPA] to regulate purely internal business operations."); *Bhatti v. Buckland*, 328 N.C. 240, 245–46 (1991) (the Act regulates unfair and deceptive conduct in interactions between market participants); *Alexander v. Alexander*, 250 N.C. App. 511, 516 (2016) (UDTPA not implicated when "the unfairness of [Defendant's] conduct did not occur in his dealings with [other market participants]" (citation omitted)); *Wheeler v. Wheeler*, 2018 NCBC LEXIS 38, at *12 (N.C. Super. Ct. Apr. 25, 2018) ("Section 75-1.1 does not apply to the internal conduct of individuals within a single market participant. Rather, the General Assembly intended section 75-1.1 to apply to interactions between market participants." (cleaned up)).

54. THC turns unsuccessfully to the Supreme Court's opinion in *Sara Lee Corp. v. Carter*, 351 N.C. 27 (1998), for support. In *Sara Lee*, the Supreme Court determined that the wrongdoer, Carter, was more than just an employee acting to harm his own employer. He was also a vendor who had engaged with the company in commercial transactions in the marketplace. In this unusual fact scenario, the Court held that Carter's status as an employee could not be used as a shield against his liability as a vendor. *Sara Lee Corp.*, 351 N.C. at 33. Unlike Carter in *Sara Lee*, Smith was not THC's vendor. THC alleges that Smith's acts were wrongful because they violated its expectations of him in the employment context.

55. Because the conduct at issue was internal and not "in or affecting commerce," the Motion shall be **GRANTED**, and Count V, the claim for violation of the UDTPA, is dismissed without prejudice.

E. Civil Conspiracy

56. "Civil conspiracy is not an independent cause of action in North Carolina. Rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct." *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 104, at **18 (N.C. Super. Ct. Oct. 9, 2018) (citing *Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002)). As observed by our Supreme Court:

> Accurately speaking, there is no such thing as a civil action for conspiracy. The action is for damages caused by acts committed pursuant to a formed conspiracy, rather than by the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies against anyone. The gist of the civil action for conspiracy is the act or acts committed in pursuance thereof – the damage – not the conspiracy or the combination. The

combination may be of no consequence except as bearing upon rules of evidence or the persons liable.

*Reid v. Holden*, 242 N.C. 408, 414–15 (1955) (quoting 11 Am. Jur. 577, Conspiracy, § 45).

57. To support allegations of civil conspiracy "a plaintiff must allege '(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme.'" *Glob. Textile All., Inc.*, 2018 NCBC LEXIS 104, at **18–19 (quoting *Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350 (2011)). As stated above, however, proof of a civil conspiracy "does no more than associate the defendants together . . . The gravamen of the action is the resultant injury, and not the conspiracy itself." *Henry v. Deen*, 310 N.C. 75, 87 (1984) (citation omitted). Therefore, in addition to an agreement, to state a claim there must be an allegation of a wrongful act that causes damage in furtherance of the agreement. *Fox v. Wilson*, 85 N.C. App. 292, 301 (1987).

58. Smith argues that because the claims for misappropriation of trade secrets, fraudulent concealment while he was employed, and UDTPA claims fail, there is no viable allegation that a wrongful act was taken in furtherance of any agreement with Inks, Manatee, and APE to violate the law. (Def.'s Br. at 28.) Therefore, Smith contends, the conspiracy claim fails.

59. The Court agrees. Because the claims alleging conduct that involved Smith, Inks, Manatee, and APE, have been dismissed, the conspiracy theory based on those

claims has no application. Accordingly, the Court **GRANTS** the Motion with respect to Count VI, civil conspiracy, and dismisses this count without prejudice.

## IV.   CONCLUSION

60.   **WHEREFORE**, the Court hereby **GRANTS in part** and **DENIES in part** the Motion and **ORDERS** as follows:

a.  With respect to the First Cause of Action (Breach of Contract), the Motion is **GRANTED,** and the claim is dismissed with prejudice.

b.  With respect to the Second Cause of Action (Fraud – Work with Albany Rubber & Gasket), the Motion is **DENIED**.

c.  With respect to the Third Cause of Action (Fraud – Work with Mr. Inks, Manatee, and APE), the Fourth Cause of Action (Misappropriation of Trade Secrets), the Fifth Cause of Action (Violation of the North Carolina Unfair and Deceptive Trade Practices Act), and the Sixth Cause of Action (Civil Conspiracy), the Motion is **GRANTED**, and these claims are dismissed without prejudice.

**SO ORDERED**, this the 28th day of March 2025.

/s/ Julianna Theall Earp
Julianna Theall Earp
Special Superior Court Judge
  for Complex Business Cases